## RICE *v.* ISHAM.

September, 1863.

This court will not reverse a judgment on the report of a referee, unless

---

* Reversing 4 *Paige,* 460, and the latter case reversing 1 *Edw.* 459.
† Affirmed in 7 *Hill,* 207.

the findings of fact show affirmatively the error on which the appellant relies.*

Defendant adopted a corporate name in which to carry on business, and authorized an agent to draw bills on his factor, and subsequently transferred the business to a company organized under that name. *Held,* that he was liable to the factor for money paid on bills drawn in the same name, by the agent, after the transfer, and paid in good faith, and without notice of the transfer.

Where it is the usual course of business for a factor to accept bills drawn by his principal and return them to him, to be used for raising money as he pleases, the factor's possession of such bills bearing the blank indorsement of the principal is sufficient *prima facie* evidence of ownership to enable the factor to recover from the principal the money paid thereon at maturity, in the absence of proof of an unlawful diversion.

A creditor does not exonerate his debtor by agreeing with a third party who assumes payment of the debt, to receive payment from the latter in negotiable paper, if the agreement is never carried into effect. Giving credit in account for such paper, under a mistake, is not conclusive on this question.

One standing in the position of a surety is not exonerated by an agreement of the creditor to give time to the principal debtor, if the agreement was made with the consent of the former.

Henry G. Rice and others sued Ralph H. Isham, for money paid. The action was in the nature of assumpsit for money paid to the defendant's use at his request, and was brought in the New York common pleas, to recover an alleged balance of three thousand seven hundred and seventy-two dollars and nine cents, claimed to be due to the plaintiffs, for advances as the factors of the defendant, who was a manufacturer of felt goods at Glenville, in Connecticut, the plaintiffs carrying on their business at the city of Baltimore. The facts, as found by the referee before whom the case was tried, were as follows : In February, 1852, an arrangement was entered into between the parties by mutual letters passing between them to the effect that the defendant should make consignments of his goods to the plaintiffs for sale on commission, and

* By the amendment of section 268 in 1869, it is not necessary to insert the findings, &c., at large, in the case, but it is enough that they appear in the judgment roll. It had been otherwise held in Philbin v. Patrick, *March,* 1868. See also Wiltsie v. Eaddie.

that the plaintiffs should accept the defendant's bills at six months for two-thirds of the market value of the goods. During the course of the dealings which ensued, the individuals of the firm of the factors was changed by the retirement of one of the partners and the taking in of a new partner; but after the close of the transactions the out-going partner assigned his interest in the claim against the defendant to the plaintiffs, and no point is now made upon the question of parties. Business of the character contemplated was commenced and carried on down to and including June 17, 1854, one Whittal acting as the agent of the defendant, he having been named by the defendant to the plaintiffs as the person who, on behalf of the defendant, would forward the goods and draw the drafts. Eight several consignments of goods were made to the plaintiffs, the last of which was forwarded January 21, 1854. The defendant drew a large number of bills on the plaintiffs, the last of which was dated June 17, 1854. These were drawn by Whittal as agent, to the order of, and were indorsed by, the defendant, and they were payable six months after date. They were accepted and paid at maturity by the plaintiffs, the drawees. The goods consigned were, after considerable delay, finally sold; and, after crediting the proceeds, there remained a balance due from the defendant to the plaintiffs on February 20, 1856, of the amount above mentioned.

The defense set up arose in part out of an alleged change in the proprietorship of the manufacturing business, by means of which, as the defendant insisted, the liability for the advances, or a portion of them, had devolved upon an association or corporation which had succeeded to the business of manufacturing the felt goods, and which had taken the place of the defendant in the dealings with the plaintiffs. On that subject the referee found that the manufacturing business was carried on in the name of the defendant until the month of December, 1853, when, for reasons of convenience and advantage to himself, the name of "The Glenville Woolen Company" was used by him, but without any change of interest; and that on May 25, 1854, a preliminary meeting for the organization of a company under the laws of Connecticut was held, and that on

the next day a second meeting was held; but that the plaintiffs had no notice of such movements until on or about July 13, 1854; that said company was not completely organized, or authorized to commence business until December 13 in that year; that the plaintiffs had never received any notice forbidding them to pay their acceptances, that they had not received any consideration for discharging the defendant from his liability, nor had ever agreed to discharge him or to accept the corporation as their debtor instead of the defendant. The referee accordingly reported that in point of law the plaintiffs were entitled to recover the above mentioned balance with interest; and judgment was rendered accordingly, which was affirmed at a general term.

*I. T. Williams*, for defendant, appellant.

*J. H. Reynolds*, for plaintiffs, respondents.

By the Court.—Denio, Ch. J. [After stating the facts.]— Upon this statement of facts, it is difficult to see how any question of law can arise. *Prima facie*, it is an ordinary case between factor and principal, where the factor has advanced in excess of the proceeds of goods placed in his hands to be sold. It is very familiar law, that in such cases an action of assumpsit, upon the implied contract, arises in favor of the factor, to recover the balance against the principal. Accordingly, the trial and the argument of the defendant's counsel bring forward a variety of facts found in the testimony, which, as it is alleged, show that the referee arrived at incorrect conclusions of fact upon the evidence. Twelve of the fourteen exceptions to the report, are based upon an alleged want of evidence to sustain his conclusions. The thirteenth claims that certain facts should have been found, which are not found, and the last is a general exception to all their conclusions of law and fact. The statements of facts found contained in the case were made in pursuance of an express provision of the Code of Procedure (§ 272); and it is furthermore explicitly provided, that although questions of law, arising upon trials before a judge without a jury, and before a referee, may be reviewed upon every stage of the appeal, the questions of fact are open

to examination only upon an appeal to the general term of the court in which the trial took place. §§ 268, 272. Plain as this seems to be, upon the language of the statute, it has frequently been found necessary to re-assert it, and the decisions have been uniform and consistent. Davis v. Allen, 3 N. Y. 168; Esterly v. Cole, Id. 502; Borst v. Spelman, 4 Id. 284; Western v. Genesee Mutual Ins. Co., 12 Id. 258; Dunham v. Watkins, Id. 556; Griscom v. Mayor of N. Y., Id. 586; Hunt v. Bloomer, 13 Id. 341; Johnson v. Whitlock, Id. 344; Magie v. Baker, 14 Id. 435; Smith v. Grant, 15 Id. 590; Turner v. Haight, 16 Id. 465; Otis v. Spencer, Id. 610; Griffin v. Marquardt, 17 Id. 28; Viele v. Troy & Boston R. R. Co., 20 Id. 184; Carman v. Pultz, 21 Id. 547; Grant v. Morse, 22 Id. 323. Some of these cases, and especially the one last noted, show that it is the duty of the party who designs to appeal to this court, to procure such a finding of the facts, as to show affirmatively the error upon which he relies. If it cannot be made out, from the findings, whether the judgment is right or wrong, it will be assumed to be correct, and will accordingly be affirmed; in other words, the judgment must appear to be erroneous by applying the conclusions of law, or the general judgment pronounced, to the conclusion of facts stated in the findings, or the appellant cannot ask for a reversal. But, as has been said, the facts found in the present case fully sustain the judgment given, and it must, therefore, be affirmed.

It sometimes happens that by an inadvertence of counsel the facts are presented in such a manner that it is impossible, without violating well-settled rules of practice, to do justice between the parties. In such cases it is in our power to suspend the judgment here, in order to enable the party whose rights might otherwise suffer, to apply to the court from whose judgment the appeal was taken, for a re-settlement of the case. It having been very earnestly insisted in this case that, if the facts could be examined, without prejudice from the findings of the referee, it would appear that the judgment was manifestly wrong, I have looked into the testimony with a view to the exercise of the jurisdiction referred to, if it could be invoked.

It is contended that the defendant ought not to be charged

with two of the drafts which were drawn upon, and accepted
and paid by, the plaintiffs, because, as it is said, they were
drawn after the defendant had disposed of his interest in the
manufacturing business. They were dated respectively May 27
and June 17, 1854, for eight hundred dollars and seven hun-
dred dollars, by Whittal, as agent, and were in no manner dis-
tinguishable in form, or otherwise, from those which he had
been accustomed to draw when the defendant was confessedly
carrying on the business under the name of The Glenville
Woolen Company. Conceding that the transfer of interest
had taken place before their date, the plaintiffs had no notice
of any such fact, nor of any change in the proprietorship of
the business, until July 13, which was nearly a month after
the drawing of the last. · Whittal was the individual named by
the defendant as the person who would draw the drafts on his
behalf, and he had drawn all which preceded these two in ques-
tion. Upon these drafts there could be no question but that
the acceptances were properly chargeable to the defendant. If
one employs an agent who deals with another on account of his
principal, and he revoke the agency but do not give notice to
the party with whom the agent had dealt, the principal is
bound by the subsequent dealings had in good faith with the
agent. *Pal. on Ag.* by Lloyd, 170, 188 ;. *Story on Ag.* § 470 ;
2 *Kent Com.* 615 ; Vernon *v.* Manhattan Co., 22 *Wend.* 183.

Another position of the defendant's counsel is that the
plaintiffs' acceptances, to a considerable amount, matured and
were paid after the defendant had ceased to be interested in
the business, and it had passed into the hands of a corpora-
tion. It is urged that there is no evidence that the accept-
ances had been negotiated to a *bona fide* holder. The course
of business was for Mr. Whittal to send the drafts, which were
payable at six months, to the plaintiffs for acceptance, who re-
turned them accepted, either to Whittal or to some other agent
of the drawer named by him. The evidence does not show
who was the holder when this paper matured, though the cir-
cumstances render it extremely probable that the defendant or
Whittal used them by procuring them to be discounted in the
course of the business. Still the evidence is not positive to
that point. When produced by the plaintiffs on the trial they

all bore the blank indorsement of the defendant. To charge the plaintiffs with having paid them in their own money so as to deprive them of the right to charge the defendant with such payment, an unlawful diversion of them should have been proved, and that plaintiffs paid them with notice of such diversion. As the evidence stands, it presents only the case of the plaintiffs accepting negotiable bills at the defendant's request, under the arrangement to accept by way of advance, placing such acceptances in his hands to do with them as he pleased, and paying the bills to the holder at maturity. There is, I think, no principle which can justly preclude the plaintiffs from charging the defendant with the money thus paid.

The defendant's counsel contends, lastly, that the plaintiffs have released the defendant by means of their dealings with the company to whom he had transferred the manufacturing business. The defendant gave in evidence an instrument dated June 28, 1854, by which certain parties describing themselves as the president, treasurer, and agent of The Glenville Woolen Company, in consideration of a transfer to that company made by the defendant, of the property employed in the manufacturing business there, engaged to assume the defendant's liabilities incurred in that business, and to indemnify him against such liabilities. The plaintiffs received notice of the change of the business on July 13 thereafter, and a few days later they were informed that the company had assumed the defendant's liabilities.

In the latter part of the summer of 1854 the goods which the plaintiffs had received from the defendant to sell had fallen in price, and it had become difficult to sell them, and they became anxious for a reduction of their advances, the balance of which amounted to over eight thousand dollars, which exceeded the proportions of the then market value of the goods for which they had agreed to accept in advance, and the drafts they had accepted were about maturing. They consequently contracted for such reduction. The correspondence was with Whittal, who had become the managing agent of the new proprietors, who, as has been mentioned, had assumed the liabilities of the defendant. The defendant insists, in the first place, that the plaintiffs had so contracted as to accept the new com-

pany as their debtors in the place of the defendant and to discharge the latter. But there is no evidence of an intention on their part to make such change. They had been told that this company had undertaken to discharge the liabilities of the defendant. It was indifferent to them what party paid them, so that they were paid by some one, and they naturally called upon Whittal and the other persons who represented this company, for payment, as this company had been named to them as the parties who were to liquidate their liabilities. This was the more proper because the company had become the owners of the goods on their hands, and entitled to control them, subject to the factor's lien. There was nothing in the correspondence which ensued which operated as a release of the defendant, unless the making and transmission of the bills and notes to be now mentioned had the effect of extending the time of payment of the debt which the defendant owed them. By the letters which passed between Whittal and the plaintiffs from August 31 to November 13, 1854, inclusive, an understanding seems to have been arrived at that the plaintiffs' account should be reduced by the payment of three thousand dollars in cash; and that they should receive the drafts of the company on themselves for about six thousand two hundred dollars, payable on time, which they should procure to be discounted at the then prevailing rate of interest, in order to place themselves in funds, and in the mean time sales of the remaining goods were to be made as fast as practicable. Accordingly, on November 13, Whittal sent to the plaintiffs three drafts of the company, amounting together to six thousand two hundred dollars, bearing different dates in October and November, each payable six months from date, " to be discounted," as his letter expressed it, " and the proceeds used in liquidation of advances made against goods held by you on our account." The plaintiffs immediately acknowledged the receipt of the drafts, saying that it " would all be very well if they had been accompanied with a check for $3,000," which they hoped he would still remit. They did not procure the drafts to be discounted or use them in any way, and the three thousand dollars was never remitted,—Whittal, writing them on November 18, saying that he could not possibly send the

Rice *v.* Isham.

cash at present on account of the extreme pressure of the money market.

These drafts did not operate to extend the time of payment of the balance due from the defendant; for, first, they were only to be received in connection with the cash payment which was to have been made at the same time, and which was never made; and, secondly, they never became operative instruments in the hands of the plaintiffs. They were the drawees, and could never have maintained an action on them against the drawers and indorsers. It is unnecessary to say what would have been their effect if the plaintiffs had procured them to be discounted by third parties; but this they did not do, apparently because Mr. Whittal had not fulfilled his part of the arrangement under which they were sent.

But some time in April, 1855, Whittal sent to the plaintiffs two promissory notes of this company dated respectively on the first and twenty-seventh of that month, for one thousand dollars each, and payable six months after date. The purpose of transmitting this paper is not fully explained, but it seems probable from the correspondence that it had some reference to the cash payment agreed to be made the preceding year. The receipt of these notes is relied upon as extending the payment of so much of the debt due from the defendant, the argument being that, under the circumstances, the defendant is to be considered as standing in the relation of a surety for the company, it being the principal debtor. I hardly believe these notes were sent on March 22, 1855. The plaintiffs being apparently under some apprehension that the ground now relied upon might be taken, addressed themselves directly by letter to the defendant. They mentioned to him that the balance in their hands was about eight thousand dollars, and gave him a statement of the quantity of goods remaining unsold. They then referred to an interview between Mr. Chase, one of the plaintiffs' firm, the defendant himself, and Whittal, a few weeks before, in which it was, as they say, agreed that their advances should be reduced by the Glenville Company, giving their notes for that purpose, with a letter from the defendant approving the same, and that they, the plaintiffs, had learned by a letter from Whittal that he desired a little more time to

perfect that arrangement, and that they would be satisfied with an answer from him that it should be arranged in the first two weeks of the next month. The defendant answered that letter from New York the next day. He makes no denial of the interview referred to by the plaintiffs, or of the arrangement said to have been made, but says he will lay their letter before Whittal on his return from a journey upon which he was then absent; that he knows no reason why an arrangement he had agreed upon should not be carried out by him within the time suggested. This letter is somewhat cautious, and a little evasive; and looking at it in the light of subsequent events, there is some ground to suspect an intention to lead the plaintiffs on to a committal which would discharge the defendant from his liability. It imports, however, *prima facie*, the consent of the defendant, that the plaintiffs might receive the notes of the company without prejudice to his liabilities, and such is the sense in which the plaintiffs had, in my opinion, a right to receive it, and in which they certainly did regard it. That they did so regard it is entirely evident from their receiving the notes of the company shortly afterward. The notes were not paid, but were protested at maturity, and the company failed in December following. The defendant cannot, in my judgment, object that the plaintiffs had given time to the company to his prejudice, as the evidence shows that the notes were taken with his consent, and in pursuance of an arrangement to which he was a party. There are some minor circumstances relied upon by the defendant's counsel, but which do not materially change the aspects of the case. The drafts forwarded in November were at one time credited in an account current, but were taken out upon the re-statement of the account. As they were never operative against the company, or any one, the crediting them was simply an error in book-keeping which did not prejudice the defendant.

Upon a review of the whole case, my conclusion is that the defendant had no defense to the claim upon which the judgment was recovered, and that we should not be able to reverse it if the review had been upon the facts.

All the judges concurred, except ROSEKRANS, J., absent.

Judgment affirmed, with costs, with three per cent. damages.